IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TIME INSURANCE COMPANY, et al.** | : | |
| | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 14-4149 |
| | : | |
| **ASTRAZENECA AB, et al.** | : | |

MEMORANDUM

**MCHUGH, J.**                                                                                  **OCTOBER 1, 2014**

### I.      Factual Background

This is an antitrust action brought under a variety of state statutes in which the issue presently before me is the propriety of federal jurisdiction. Plaintiffs are health insurance companies who ultimately paid for Nexium prescriptions purchased by individuals who maintained insurance coverage. Defendants are Astrazeneca, the patent-holding pharmaceutical company that produces name-brand Nexium, as well as three generic drug manufacturers who sought to produce generic Nexium.

Under the regulatory framework for pharmaceuticals, companies maintain exclusive patents on their drugs for a set period of time. However, the Hatch-Waxman Act, which amended the Food, Drug, and Cosmetics Act, 21 U.S.C. §§ 301–392, and other legislation, have created incentives for generic manufacturers to seek generic approval prior to the expiration of the patent. The patent-holder then files an infringement suit in order to prevent entrance of the generics to the market. This ensures an efficient system in which patent-holders are not abusing the patenting system to maintain a monopoly. First-filing generic manufacturers receive a 180-day window in which no other generic brands may sell on the market with the exception of any

1

generic produced by the patent-holder. This provides strong incentive to challenge the validity of patents.

Plaintiffs allege that after the three generic manufacturers challenged the Nexium patents, and were subsequently sued for patent infringement in the District of New Jersey, Astrazeneca entered into reverse payment settlement agreements with them through which Astrazeneca provided compensation in exchange for stipulations that the Nexium patents were valid and promises not enter the market until the expiration of those patents. The generic companies did not receive direct payments, but allegedly received compensation in the form of outsized payments for other services and nullification of potential liabilities to Astrazeneca.

Currently, other suits based on these same agreements have been aggregated as multi-district litigation within the District of Massachusetts. The Plaintiffs filed this action in the Philadelphia Court of Common Pleas based entirely on state law antitrust claims. The Defendants removed the action on the basis that: (1) resolution of the state law antitrust claims will necessarily involve litigation of the validity of the Nexium patents; (2) any such litigation will involve a collateral attack on the federal consent judgments entered by the District of New Jersey; and (3) The Class Action Fairness Act (CAFA) requires that this action be combined with a related action filed in state court and removed here, Cariten v. Astranzeneca,[1] as a "mass action" capable of conferring federal jurisdiction.[2]

---

[1] Docket No. 14-cv-04156, originally filed in the Court of Common Pleas, Philadelphia County, January Term, 2014-2106.

[2] This action contains 90 plaintiffs. In Cariten, the same lawyers filed an identical case alleging the same state law causes of action, against the same defendants, in the same court at almost the same time, for 30 additional plaintiffs.

2

II.     **Remand on Ground that Resolution of Plaintiffs' Claims does not Necessarily Involve Litigation of Patent Issues**

Complete diversity does not exist amongst the Plaintiffs and the Defendants in this action—therefore, diversity jurisdiction is not proper. The Plaintiff-insurance companies assert their antitrust claims in the form of six state law causes of action, and the Defendant-pharmaceutical companies have removed based on a federal question theory. Federal question jurisdiction under 28 U.S.C. § 1331 provides federal courts with jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States."

It is firmly established that "[t]he presence or absence of federal question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987); see also Louisville & Nashville R. Co. v. Mottley, 211 U.S. 149, 152 (1908). Defenses that may be raised are not a part of the plaintiff's well-pleaded complaint. Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 63 (1987). "[A] case may not be removed to federal court on the basis of a federal defense, . . . even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case." Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for Southern Cal., 463 U.S. 1, 14 (1983). Furthermore, federal jurisdiction extends "only to those cases in which a well-pleaded complaint establishes either that federal patent law creates the cause of action, or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." Christianson v. Colt Industries Operating Corp., 486 U.S. 800, 809 (1988).

3

Plaintiffs' claims are brought under the antitrust laws of many separate states. As Defendants point out,[3] and Plaintiffs do not dispute, these claims all seem to involve very similar elements that can be reduced to two components. An antitrust plaintiff must demonstrate (1) the existence of anticompetitive conduct by the defendant and (2) that the conduct caused the plaintiff's alleged injuries. In this case, on the issue of remand, the key question is whether Plaintiffs can assert a theory in which they can demonstrate these two elements without litigating the validity of Astrazeneca's patents at the time the agreements were entered into.

### A. Anticompetitive Conduct

As to the first element, the anticompetitive conduct, the threshold issue is whether settlements between Defendants can be shown to have been anticompetitive irrespective of the validity of the patents. Defendants argue that anticompetitive conduct cannot be proven without a showing that the patents were invalid. According to Defendants, if the patents had been valid at the time the settlements were entered into, Astrazeneca would have had every right to exclude the generic manufacturers from the market. Therefore, Defendants conclude, Plaintiffs must

---

[3] See, e.g., Marsh v. Anesthesia Servs. Med. Grp., 132 Cal. Rptr. 3d 660, 672 (Cal. Ct. App. 2011); Peterson v. Visa U.S.A. Inc., No. 03-8080, 2005 D.C. Super. LEXIS 17, at *10–16 (D.C. Super. Ct. Apr. 22, 2005); Davis v. Four Seasons Hotel Ltd., 228 P.3d 303, 339 (Hawaii 2010); Popp v. Cash Station, Inc., 613 N.E.2d 1150, 1158 (Ill. App. 1 Dist., 1992); Southard v. Visa U.S.A. Inc., 734 N.W.2d 192, 198–99 (Iowa 2007); O'Brien v. Leegin Creative Leather Prods., 277 P.3d 1062, 1075 (Kan. 2012); Knowles v. Visa U.S.A. Inc., No. 03-707, 2004 Me. Super. LEXIS 227, at *14–15 (Me. Super Ct. Oct. 20, 2004); DXS, Inc. v. Siemens Med. Sys., 991 F. Supp. 859, 865 (E.D. Mich. 1997) (Michigan law); Lorix v. Crompton Corp., 736 N.W.2d 619, 631 (Minn. 2007); Owens Corning v. R.J. Reynolds Tobacco Co., 868 So. 2d 331, 343–44 (Miss. 2004); Kanne v. Visa U.S.A. Inc., 723 N.W.2d 293, 297–99, 303 (Neb. 2006); In re Dynamic Random Access Memory Antitrust Litig., 536 F. Supp. 2d 1129, 1135 n.2, 1135–42 (N.D. Cal. 2008) (Nevada law); Gatt Commc'ns., Inc. v. PMC Assocs., 711 F.3d 68, 81–82 (2d Cir. 2013) (New York law); Rose v. Vulcan Materials Co., 194 S.E.2d 521, 530 (N.C. 1973); In re Copper Antitrust Litig., 98 F. Supp. 2d 1039, 1048–49, 1057 (W.D. Wis. 2000) (Rhode Island law); Fucile v. Visa U.S.A., Inc., No. S1560-03-CNC, 2004 Vt. Super. LEXIS 42, at *8–9 (Vt. Super. Dec. 27, 2004); In re G-fees Antitrust Litig., 584 F. Supp. 2d 26, 40–41 (D.D.C. 2008) (West Virginia and Wisconsin law); Schweizer v. Riverside Methodist Hosps., 671 N.E.2d 312, 315 (Ohio Ct. App. 1996); See also Ariz. Rev. Stat. § 44-1412 (harmonization provision); D.C. Code § 28-4515 (same); Fla. Stat. § 542.32 (same); Iowa Code § 553.2 (same); Mass. Gen. Laws ch. 93A, § 2(b) (same); Mich. Comp. Laws. § 445.784(2); Neb. Rev. Stat. § 59-829 (same); Nev. Rev. Stat. § 598A.050 (same); N.H. Rev. Stat. Ann. § 356:14 (2010) (same); N.M. Stat. Ann. § 57-1-15 (same); Or. Rev. Stat. § 646.715 (same); R.I. Gen. Laws § 6-36-2(b) (same); S.D. Codified Laws § 37-1-22 (same); Utah Code Ann. § 76-10-3118 (same); W. Va. Code § 47-18-16 (same).

now prove the invalidity of the patents in their prima facie case. Plaintiffs combat this by relying on the Supreme Court's recent decision in F.T.C. v. Actavis, Inc., 133 S. Ct. 2223 (2013). In Actavis, the Court examined an almost identical scenario where a patent-holding drug manufacturer entered into reverse payment settlements with generic manufacturers akin to those in the case before this Court. In its decision, the Court observed that "it is normally not necessary to litigate patent validity in order to answer the antitrust question." Id. at 2236. In a reverse payment settlement case, "[a]n unexplained large reverse payment itself would normally suggest that the patentee has serious doubts about the patent's survival." Id. Such a large payment "suggests that the payment's objective is to maintain supracompetitive prices to be shared among the patentee and the challenger rather than face what might have been a competitive market—the very anticompetitive consequence that underlies the claim of antitrust unlawfulness." Id. The size of such a settlement "can provide a workable surrogate for a patent's weakness, all without forcing a court to conduct a detailed exploration of the validity of the patent itself." Id. at 2236–37.

In light of Actavis, it seems as though the Plaintiffs can conceivably prove the existence of anticompetitive conduct in violation of state antitrust laws without litigating the patent issue, but by instead relying on the nature of settlements themselves. As the Court points out, the relevant inquiry is the reasoning behind the alleged anticompetitive conduct. Id. at 2237. "If the basic reason is a desire to maintain and to share patent-generated monopoly profits, then, in the absence of some other justification, the antitrust laws are likely to forbid the arrangement." Id. An improper motive may be determined without litigating the patent issue, and thus the plaintiff is not forced into federal court by the initial "anticompetitive conduct" element. Nonetheless, the

defendants in such a case may unquestionably assert that the patents were valid as a defense to characterization of the conduct as anticompetitive.

As noted above, there were no direct payments in this case: reverse payments took the form of outsized payments for other services and nullification of potential liabilities to Astrazeneca.  There is currently a rift within the federal judiciary over whether <u>Actavis</u> applies to reverse payment agreements under which the compensation provided by the patent-holder takes a form other than direct cash settlements.  The issue has been considered by four district courts in the wake of <u>Actavis</u>.  Two have interpreted <u>Actavis</u> to require cash payments:  <u>In re Lamictal Direct Purchaser Antitrust Litigation</u>, No. 12-cv-995, 2014 WL 282755, at *7 (D.N.J. Jan. 24, 2014); <u>In re Loestrin 24 Fe Antitrust Litigation</u>, MDL No. 13-2472-S-PAS, 2014 WL 4368924, at *13 (D.R.I. Sept. 4, 2014).  Having carefully considered the competing analyses, I am persuaded by Judge Dubois, who sits within this district, and Judge Young, who is currently handling the other suits stemming from these transactions, and who made his reverse payment determination in the specific context of the Nexium agreements at issue here.  In my opinion, reverse payments deemed anti-competitive pursuant to <u>Actavis</u> may take forms other than cash payments.  See <u>In re Niaspan Antitrust Litigation</u>, 2014 WL 4403848, at *10 (E.D. Pa. Sept. 5, 2014); <u>In re Nexium (Esomeprazole) Antitrust Litigation</u>, 968 F. Supp. 2d 367, 392 (D. Mass. 2013).  Accordingly, Plaintiffs can establish the first essential element of their claims.

### B. *Causation of Damages*

Plaintiffs then assert that in light of <u>Actavis</u> they need not litigate the patent issue at all in proving their case.  In reading <u>Actavis</u>, however, it seems as though the Supreme Court's analysis focused on litigation of patent issues goes no further than a determination of the

*existence* of anticompetitive conduct. Defendants persuasively argue that the action in Actavis was brought by the FTC under § 5 of the FTC Act pursuant to its public enforcement powers, and sought only declaratory and prospective injunctive relief, not damages. Def. Brief at 14 (citing Pet. for Writ of Cert. at 31–32, FTC v. Watson Pharms., Inc., 133 S. Ct. 2223 (2013)). Against that background, Actavis may not definitively answer whether the causation of damages can be shown without litigating the validity of these patents.

Defendants therefore maintain that even if anticompetitive conduct can be demonstrated to exist without litigating the patent issue, such conduct cannot be proven to have caused the alleged damages unless the patents were in fact invalid. By Defendants' reasoning, the anticompetitive conduct only caused the Plaintiffs' damages if the generic Defendants would have entered the market prior to the date agreed upon in the settlements, which Defendants further assert would have happened only if the patents were invalid, because Defendants otherwise would have had an enforceable legal right to exclude the generics from the market. In fact, the Defendants stress that the complaint repeatedly alleges that but-for the settlement agreements, the patents would have been invalidated and the generics would have entered the market. See Def. Brief 10–11; Notice of Removal ¶¶ 7–8 (quoting examples from complaint).

Without abandoning their position that Actavis allows them to prove their entire case without litigating the patent issue, Plaintiffs counter that the generics would have entered the market earlier even if the patents were valid, because generic manufacturers often begin selling while the patent litigation is underway (so-called "at-risk" sales). Moreover, at least one federal court has recognized that Astrazeneca may alternatively have licensed a generic to enter the market in lieu of reverse payment settlements. In re Ciprofloxacin Hydrochloride Antitrust Litigation, 166 F. Supp. 2d 740 (E.D.N.Y. 2001).

7

Although Defendants correctly characterize the Complaint's factual allegations about the patents as highly specific, Plaintiffs' claims for relief are couched more broadly and do not allege any precise theories beyond the existence of anticompetitive agreements that caused the Plaintiffs to overpay by foreclosing the availability of lower priced generics. Included in the complaint is this broad formulation of Plaintiffs' causation theory:

> Defendants' Exclusion Payment Agreements have delayed generic competition and unlawfully enabled AstraZeneca to sell Nexium without generic competition. But for Defendants' illegal conduct, one or more generic competitors would have begun marketing AB-rated generic versions of Nexium well before May 27, 2014, and AstraZeneca would have simultaneously launched an authorized generic version of Nexium.

Compl. ¶ 210.

To that extent, Plaintiffs can rely on the following language in Christianson, supra:

> Nor is it necessarily sufficient [for federal question jurisdiction] that a well-pleaded claim alleges a single theory under which resolution of a patent-law question is essential. If on the face of a well-pleaded complaint there are . . . reasons completely unrelated to the provisions and purposes of [the patent laws] why the [plaintiff] may or may not be entitled to the relief it seeks, then the claim does not "arise under" those laws. Thus, a claim supported by alternative theories in the complaint may not form the basis for § 1338(a) jurisdiction unless patent law is essential to each of those theories.

Christianson, 486 U.S. at 810. To defeat removal, Plaintiffs need only allege a single theory that does not require the resolution of patent law.

Plaintiffs rely on In re Ciprofloxacin Hydrochloride Antitrust Litigation ("Cipro"), 166 F. Supp. 2d 740 (E.D.N.Y. 2001). The plaintiffs there asserted that the same kind of reverse payment settlement agreements interfered with their ability to purchase low-cost generics. The case was removed on the same theory asserted by the Defendants here, but then remanded. The court concluded under Christianson that **all** theories asserted by the plaintiffs must involve the resolution of patent law in order to create federal question jurisdiction. Defendants here seek to

8

distinguish Cipro on the ground that Plaintiffs have not pleaded the theory of causation they now advance in opposing remand. I am not persuaded that this is essential, and it is clear that the plaintiffs in Cipro also expanded their theories during argument.

> At oral argument, plaintiffs expanded upon the theories advanced in their complaints, and asserted that, as a matter of fact, Bayer would have authorized Barr to distribute ciprofloxacin by granting Barr a license, or by other means, had Barr not agreed to drop its challenge to the validity of the ′444 patent in exchange for large cash payments . . . . Plaintiffs contend that, as a result, they were denied the opportunity to purchase ciprofloxacin at competitive, or at least lower, prices. This result is sufficient to satisfy the "injury-in-fact" element of an antitrust claim.

In re Ciprofloxacin, 166 F. Supp. 2d at 748.

Cipro also makes clear that defeating a patent is not the only way in which a plaintiff can prove anti-competitive effect.

> Defendants correctly point out that patent holders have no duty to grant licenses, and that Bayer's failure to grant a license therefore cannot form the basis of a cause of action under any state's antitrust laws. However, plaintiffs do not contend that Bayer breached a duty to license. Rather, **plaintiffs assert in their state law complaints that Barr would *in fact* have entered the market with a generic version of ciprofloxacin prior to the expiration of Bayer's patent**. Any license or other arrangement for distributing a generic version of ciprofloxacin was forestalled by the Agreement, which provided defendants with a more attractive resolution of the patent challenge.

In re Ciprofloxacin, 166 F. Supp. 2d at 748 (emphasis added).

Numerous district courts facing similar issues have ruled in favor of remand. See, e.g., In re Ciprofloxacin, 166 F. Supp. 2d 740 (E.D.N.Y. 2001); McGrew v. Schering–Plough Corp., No. 01–2311–GTV, 2001 WL 950790 (D. Kan. Aug. 6, 2001); Altman v. Bayer Corp., 125 F. Supp. 2d 666 (S.D.N.Y. 2000); Drug Mart Pharmacy Corp. v. Abbot Labs., No. 00–631–CV, slip op. (E.D.N.Y. Aug. 28, 2000); In re Cardizem CD Antitrust Litig., 90 F. Supp. 2d 819 (E.D. Mich. 1999); Aetna United States Healthcare v. Hoechst Aktiengesellschaft, 54 F. Supp. 2d 1042 (D. Kan. 1999).

In Anthem, Inc. v. Bristol-Myers Squibb Co., 2003 U.S. Dist. LEXIS 15762, at *14-15 (D.N.J. 2003), the district court found that a general, relatively conclusory allegation that generics would have entered the market irrespective of the validity of the patent was a theory supporting remand, because the patent validity issue would only arise as a defense. Id. at *15.

Defendants rely heavily on In re Tamoxifen Citrate Antitrust Litig., 222 F. Supp. 2d 326, 333 (E.D.N.Y. 2002). The court there declined to follow Cipro, but did so specifically because litigation of patent validity **was** essential.

> On a final note, the Court finds that Cipro, *supra*, a case upon which plaintiffs most heavily rely, is distinguishable… Plaintiffs here do not allege, nor could they allege, this alternative theory, for the reason that the Zeneca/Barr Agreement included the type of licensing arrangement contemplated in Cipro.

In re Tamoxifen Citrate Antitrust Litig., 222 F. Supp. 2d at 333. Defendants also cite Schecher v. Purdue Pharma L.P., 317 F. Supp. 2d 1253 (D. Kan. 2004), and Doran v. Purdue Pharm Co., 324 F. Supp. 2d 1147 (D. Nev. 2004), but on balance these cases have far fewer factual similarities than the reverse payment cases cited by the Plaintiffs.

The unstated premise of Defendants' argument is that only total invalidity of its patents would create competitive pressure in the marketplace from generic suppliers. That position not only misapprehends the market for pharmaceuticals, but also misapprehends the "marketplace" for claims. In any litigation, a claim has potential value short of an ultimate determination in court. The value of the claim is a function of the parties' respective evaluations of risk and probability of success. Indeed, the vast majority of claims settle, and the value of many claims can be plotted along a bell curve where the value of the claim is a function of each side's conviction about strength of its position and its confidence in predicting the outcome. For example, in the context of a catastrophic personal injury claim, although a defendant might have formidable defenses to advance, in most instances the exposure created by the extent of the

10

damages in and of itself creates an intrinsic settlement value for the claim. So too in this case, without reaching the ultimate question of the validity of the patents, the risk that the generic manufacturers might enter the marketplace and demonstrate a reasonable likelihood of success in voiding the patents has an economic consequence which plaintiffs contend was blunted by unlawful agreements preventing that form of competition. Taking the analysis one step further, Plaintiffs expect to prove that such marketplace risk was in fact the motivating factor for the reverse payments that are the subject of this case. Defendants ignore these realities when they insist that only a formal legal determination of the validity of the patents would have a marketplace effect.

### C. *Substantiality*

If the necessity of litigating the validity of the patents were the sole issue in deciding remand, the issue could be considered a close one. But Plaintiffs further argue that any finding as to the validity of the patents would not have a substantial impact on federal law, or at least not substantial enough to support federal question jurisdiction. I agree.

Federal question jurisdiction "over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." Gunn v. Minton, 133 S. Ct. 1059, 1065 (2013). The substantiality of a patent issue embedded within a state law claim was examined by the Supreme Court recently in Gunn. There, the plaintiff had initially filed a patent infringement suit, suffering summary judgment and invalidation of his patent. Id. at 1062. Plaintiff's counsel then sought reconsideration, raising a new argument he had previously overlooked, but the argument was deemed to have been waived. Id. at 1062–63. The frustrated

11

inventor then filed suit in state court for malpractice based on the attorney's failure to raise the alternative argument during the initial patent infringement proceeding.  Id.  The state trial court determined that the plaintiff's patent infringement claims would have failed even if the argument had been made.  Id.  On appeal, the plaintiff then claimed that, "[b]ecause his legal malpractice claim was based on an alleged error in a patent case, it 'aris[es] under' federal patent law for the purposes of 28 U.S.C. § 1338(a)," and thus no state court should have jurisdiction.

Like Defendants here, the unsuccessful plaintiff in Gunn sought to create a federal question.  The Supreme Court refused to recognize one, and held that the patent issue in Gunn was not substantial enough to mandate jurisdiction.  Id. at 1068.  The inquiry focuses on "the importance of the issue to the federal system as a whole." Id. at 1066.  As the Court analyzed the issue,

> "although the state courts must answer a question of patent law to resolve Minton's legal malpractice claim, their answer will have no broader effects.  It will not stand as binding precedent for any future patent claim; it will not even affect the validity of Minton's patent.  Accordingly, there is no 'serious federal interest in claiming the advantages thought to be inherent in a federal forum.'"

Id. at 1068.  In the context of this litigation, there will be no legal determination of the validity of the patents.  A jury will be asked to evaluate the alleged anti-competitive conduct in question and the motivation behind it as a factual matter.  Defendants will undoubtedly assert patents as a shield, and conceivably a jury might hear testimony about the strength or validity of the patents.  Any verdict a jury might reach will not have precedential effect, and as in Gunn, its verdict will "not change the real-world result of the prior federal patent litigation." Id. at 1067.

Additionally, the Supreme Court found that state court resolution of the issue would not "undermine 'the development of a uniform body of [patent] law'" because federal district courts maintain exclusive jurisdiction over actual patent cases which do not involve such hypothetical

12

questions.  Id. (quoting Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 162 (1989)).  Neither the greater familiarity of federal courts with patent law, nor risk of incorrect resolution by a state court is, by itself, "sufficient to establish federal arising under jurisdiction."  Id. at 1068.

A jury's factual findings on causation in this case will not invalidate the consent judgments in effect in the District of New Jersey; it will not invalidate the patents; it will not serve as binding precedent; and it will not affect the administration of federal patent law.  I agree with the Plaintiffs that, even if the patent issue must be litigated, it would not have a substantial enough effect to support federal jurisdiction.

### III.     Collateral Attack of the District Court Consent Orders

In their initial Notice of Remand, Defendants contend these actions amount to a collateral attack on a consent judgment entered by the District Court of New Jersey, but they have failed to contest the Plaintiffs' responsive analysis that this is not the case.  At argument, Defendants also demonstrated a lack of enthusiasm for this position.  To the extent that Defendants have not abandoned this position, I find it to be without merit.

The issue was argued in McGrew, No. 01–2311–GTV, 2001 WL 950790, at *4, a factually-similar case involving reverse payment settlements.  The court observed that the "Plaintiff's claims do not seek to undermine or set aside the settlement agreements that were entered into in connection with defendants' federal patent litigations.  To the extent the settlement agreements are involved, they simply 'form part of the factual basis of [p]laintiff's claims.'"  Id.

13

Similarly, Plaintiffs here are not asking this Court to invalidate or set aside the settlement agreements. Rather, the Plaintiffs allege that the acts of entering into the multiple settlement agreements were collectively anticompetitive and designed to restrict competition.

### IV. Time Insurance and Cariten as a "Mass Action" Under CAFA

Defendants argue that federal jurisdiction is proper under the Class Action Fairness Act of 2005 (CAFA) because this action combined with Cariten qualified as a "mass action." 28 U.S.C. § 1332(d)(11). The point of contention is over the requirement that the action contain monetary relief claims of 100 or more persons. 28 U.S.C. § 1332(B)(i). As described above, this action contains 90 Plaintiffs, and an identical action, Cariten, was filed in the same court, by the same attorneys, at practically the same time, containing another 30 Plaintiffs. Defendants object, arguing that the Plaintiffs should not be able to evade CAFA jurisdiction by strategically and arbitrarily splitting their claims into two separate actions.

Under 28 U.S.C. § 1332(d)(11)(B)(ii)(II), a "mass action" does not include an action in which "the claims are joined upon motion of the defendant." The language of the statute appears to be very clear, and Circuit Courts that have confronted this question have unanimously agreed. See Anderson v. Bayer Corp., 610 F.3d 390, 393 (7th Cir. 2010); Scimone v. Carnival Corp., 720 F.3d 876, 884 (11th Cir. 2013) ("Every[] court of appeals confronted with this question has come to the same conclusion: that plaintiffs have the ability to avoid § 1332(d)(11)(B)(i) jurisdiction by filing separate complaints naming less than 100 plaintiffs and by not moving for or otherwise proposing joint trial in the state court."); Parson v. Johnson & Johnson, 749 F.3d 879, 886 (10th Cir. 2014); Atwell v. Boston Scientific Corp., 740 F.3d 1160, 1162–63 (8th Cir. 2013); Romo v. Teva Pharmaceuticals USA, Inc., 731 F.3d 918, 922 (9th Cir. 2013). It is also irrelevant that the

Defendants have not put forth a formal motion to consolidate when they are requesting the complaints be consolidated for the purposes of removal under CAFA.  <u>Tanoh v. Dow Chem. Co.</u>, 561 F.3d 945, 954 (9th Cir. 2009).[4]

Defendants also advance a theory that the Plaintiffs have implicitly proposed to try their claims jointly, citing <u>In re Abbott Labs, Inc.</u>, 698 F.3d 568, 573 (7th Cir. 2012).  There, the plaintiffs filed a Motion to Consolidate all pending actions to one court, "through trial," and "not solely for pre-trial proceedings."  698 F.3d at 571; <u>In re Avandia Mktg., Sales Practices & Products Liab. Litig.</u>, 07-MD-1871, 2014 WL 2011597, at *8 (E.D. Pa. May 15, 2014) (Rufe, J). In contrast, Plaintiffs here have in no way proposed that their case should be tried jointly with <u>Cariten</u> and have filed no motion for consolidation.  The Defendants point to the fact that the Philadelphia County Court of Common Pleas was likely to "exercise its discretion to join the claims *sua sponte*."  This is not enough to say that the Plaintiffs were proposing that their claims be tried together based on the uncertain possibility that this could happen if both claims were filed in state court.  This action should not be considered a "mass action" under CAFA.

In light of all of the above, the Plaintiffs' Motion to Remand shall be granted, and the case will be remanded to the Philadelphia Court of Common Pleas.  An order granting remand follows.

      /s/ Gerald Austin McHugh
United States District Court Judge

---

[4] The Third Circuit has considered the issue in a non-precedential opinion and concluded that, despite the similarity of claims, an action does not become a "mass action" unless the plaintiffs propose to try their claims jointly. <u>Abrahamsen v. ConocoPhillips, Co.</u>, 503 F. App'x 157, 160 (3d Cir. 2012). <u>Id.</u>